## DE LACEY et al. v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. May 6, 1918. Rehearing Denied July 1, 1918.)

### No. 3071.

1. CONSPIRACY ⬉43(6)—RESCUE—INDICTMENT—SUFFICIENCY.

Under Criminal Code (Act March 4, 1909, c. 321) § 141, 35 Stat. 1114 (Comp. St. 1916, § 10311), declaring that whoever shall rescue or attempt to rescue any person arrested upon a warrant or other process issued under any law of the United States, or shall directly or indirectly aid, abet, or assist any person so arrested to escape, shall be punished, an indictment charging that defendants conspired to aid and abet certain persons held in custody as enemy aliens by virtue of an order for their arrest and confinement issued by the President under Rev. St. §§ 4067–4070 (Comp. St. 1916, §§ 7615–7618), and the public proclamation of a state of war between Germany and the United States, is sufficient, though not alleging that the persons in custody were alien enemies.

2. CONSTITUTIONAL LAW ⬉252—WAR ⬉4—ALIEN ENEMIES—RIGHTS OF.

Alien enemies have no rights and no privileges, unless by special favor, during time of war; so Alien Enemy Act July 6, 1798, c. 66, 1 Stat. 577 (Rev. St. §§ 4067, 4068, 4069, and 4070), authorizing the restraint and the removal of alien enemies, is not invalid, as depriving such persons of liberty without due process of law; the constitutional safeguards not extending to enemy aliens.

3. CONSPIRACY ⬉43(5)—INDICTMENT—SUFFICIENCY—OVERT ACTS.

An indictment for conspiring to aid enemy aliens to escape from custody, into which they had been taken under the President's order for their arrest and confinement, which alleged several overt acts, is not defective because it did not set forth, verbatim or in substance, letters alleged as overt acts.

4. CONSPIRACY ⬉43(5)—INDICTMENT—OVERT ACTS.

In an indictment for conspiracy, it is not necessary to show how the act charged to be an overt act would effect the objects of the conspiracy.

5. CONSPIRACY ⬉43(5, 12)—PROOF—OVERT ACTS.

An indictment for conspiracy is sufficient, if some of the overt acts are properly pleaded; and, where several overt acts are charged, it is not necessary to prove all.

In Error to the District Court of the United States for the Southern Division of the Northern District of California; Wm. C. Van Fleet, Judge.

Lawrence De Lacey and others were convicted under Criminal Code, § 141, of conspiracy to aid and abet enemy aliens to escape from custody, and they bring error. Affirmed.

Nathan C. Coghlan, of San Francisco, Cal., for plaintiffs in error.

John W. Preston, U. S. Atty., and Annette Abbott Adams, Asst. U. S. Atty., both of San Francisco, Cal.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

GILBERT, Circuit Judge. The plaintiffs in error were convicted and sentenced under an indictment which charged them with a conspiracy to aid and abet E. H. Von Schack and Franz Bopp to escape from the custody of Col. George R. McGunnegle, an officer of the

United States Army, who was in command of the military reserve of Ft. McDowell, Cal., and who was holding said Von Schack and Bopp in his custody by virtue of an order for their arrest and confinement issued by the President on April 6, 1917, under the provisions of sections 4067, 4068, 4069, and 4070, Rev. Stats., and the public proclamation of a state of war between Germany and the United States, promulgated by the President on April 6, 1917; the said Von Schack and Bopp having ,been arrested on April 7, 1917, as alien enemies by the United States marshal at San Francisco, acting under the authority of the said order of the President, and having been turned over to the custody of said Col. McGunnegle and held by him.

[1] A demurrer was interposed to the indictment, one of the grounds of which was that it was not alleged therein that said Von Schack and Bopp were alien enemies of the United States, and it is now contended that for the omission of that allegation the indictment is fatally defective. The contention cannot be sustained. In charging a conspiracy to accomplish an unlawful rescue, it is not necessary that the charge go further than the language of the statute which defines the offense. Section 141 of the Criminal Code provides for the punishment of any one who shall rescue or attempt to rescue from the custody of any officer any person arrested upon a warrant or other process issued under the provisions of any law of the United States, or who shall aid, abet, or assist any person so arrested to escape from the custody of such officer. The indictment charges, in the language of this section, that Von Schack and Bopp were arrested and confined by virtue of an order issued by the President under the provisions of Rev. Stats. § 4067 et seq., and that they were arrested as alien enemies. Commonwealth v. Malloy, 119 Mass. 347; Commonwealth v. Lee, 107 Mass. 207; Houpt v. State, 100 Ark. 409, 140 S. W. 294, Ann. Cas. 1913C, 690; People v. Murray, 57 Mich. 396, 24 N. W. 118; State v. Sutton, 170 Ind. 473, 84 N. E. 824; Smith v. State, 76 Ala. 69.

[2] We find no merit in the contention that the law under which Von Schack and Bopp were held is unconstitutional, in that it deprives them of liberty without due process of law. The sections under which these alien enemies were held were originally enacted as the Alien Enemy Act of July 6, 1798, and from that date to this, although occasion has seldom arisen to enforce the statute, no question has been made of its constitutionality. While, as to property rights and life and liberty, all aliens domiciled in the United States, or temporarily therein, are accorded the equal protection of the law, and due process of law, such is not the case as to alien enemies. "Alien enemies have no rights and no privileges, unless by special favor, during time of war." 2 C. J. 1047. Such was the common law. "Alien enemies have no rights, no privileges, unless by the king's special favor, during time of war." 1 Blackstone, 372. There is nothing in the Constitution or laws of the United States which in any way has changed the common-law rule, or restricted the power of Congress to enact the alien enemy law. Power to enact such a law may at times be essential to the preservation of the government, and the right of all nations to exercise it is recognized in international law. In Brown

v. United States, 8 Cranch, 110, 121 (3 L. Ed. 504), Chief Justice Marshall said:

"Respecting the power of government, no doubt is entertained. That war gives to the sovereign full right to take the persons and confiscate the property of the enemy, wherever found, is conceded. The mitigations of this rigid rule, which the humane and wise policy of modern times has introduced into practice, will more or less affect the exercise of this right, but cannot impair the right itself."

Even in times of peace the admission of aliens to the United States and their presence here are not of right, but of favor. In Turner v. Williams, 194 U. S. 279, 289, 24 Sup. Ct. 719, 722 (48 L. Ed. 979) it was said:

"Repeated decisions of this court have determined that Congress has the power to exclude aliens from the United States, to prescribe the terms and conditions on which they may come in, to establish regulations for sending out of the country such aliens as have entered in violation of law, and to commit the enforcement of such conditions and regulations to executive officers; that the deportation of an alien who is found to be here in violation of law is not a deprivation of liberty without due process of law."

The first reported case arising under the Alien Enemy Act is Lockington's Case, Brightly, N. P. (Pa.) 269. Lockington, an alien enemy, had refused to comply with the executive order of February 23, 1813, requiring alien enemies who were within 40 miles of tidewater to retire to such places beyond that distance from tidewater as should be designated by the marshals. He was arrested, and on petition for habeas corpus attempted to test the legality of his imprisonment. Chief Justice Tilghman said of the act:

"It is a provision for the public safety, which may require that the alien should not be removed, but kept in the country under proper restraints. * * * It is never to be forgotten that the main object of the law is to provide for the safety of the country from enemies who are suffered to remain within it. In order to effect this safety, it might be necessary to act on sudden emergencies. * * * The President, being best acquainted with the danger to be apprehended, is best able to judge of the emergency which might render such measures necessary. Accordingly, we find that the powers vested in him are expressed in the most comprehensive terms."

On the second petition for habeas corpus Judge Yeates said:

"When the vessel of the commonwealth is in danger, partial evils must be submitted to, in order to guard against a general wreck. Aliens who have come among us before a declaration of war against their sovereign, and continue to reside among us after it, cannot expect an exemption from such evils."

And Judge Brackenridge said:

"Alien enemies, remaining in our country after a declaration of war, are to be treated according to the law of nations, and it has been so argued in this case. Shall, then, the judicial power constitute itself a judge between the executive of the general government and the nation with whom we are at war, and say whether the proceeding in the case of their subjects remaining in our country has been according to the law of nations?"

In Lockington v. Smith, 1 Pet. C. C. 466, Fed. Cas. No. 8,448, Washington, Circuit Justice, said:

"It seems perfectly clear, that the power to remove was vested in the President, because, under certain circumstances, he might deem that measure most effectual to guard the public safety. But he might also cause the alien to be restrained or confined, if in his opinion the public good should forbid his removal."

And answering the contention that judicial authority must be resorted to to enforce the regulations so established by the President under the law, he said:

"Such a construction would, in my opinion, be at variance with the spirit as well as with the letter of the law, the great object of which was to provide for the public safety by imposing such restraints upon alien enemies as the chief executive magistrate of the United States might think necessary, and of which his particular situation enabled him best to judge."

In the Case of Fries, 9 Fed. Cas. No. 5,126, Circuit Justice Iredell, charging the jury concerning the provisions of the Alien Enemy Act, said:

"In cases like this it is ridiculous to talk of the crime, because perhaps the only crime that a man can then be charged with is his being born in another country and having a strong attachment to it. He is not punished for a crime that he has committed, but deprived of the power of committing one hereafter, to which even a sense of patriotism may tempt a warm and misguided mind. * * * The opportunities during a war of making use of men of such a description are so numerous and so dangerous that no prudent nation would ever trust to the possible good behavior of many of them."

[3] Without merit, also, is the contention that the indictment is defective for its failure to set forth the contents of two letters, the sending of which by the plaintiffs in error were alleged as overt acts to accomplish the conspiracy. It is asserted that by the rules of criminal pleading, if a written document is relied upon to sustain the prosecution, it must be set forth, either verbatim or in substance, citing United States v. Watson (D. C.) 17 Fed. 145. That was a case in which the defendants were charged, under section 5511, Rev. Stats., with a conspiracy to accomplish a specified result by force, threat, intimidation, etc., or "by any other unlawful means," and, as the information alleged that the unlawful means used was a certain written instrument, it was held that the instrument should be set forth, in order that the court might know whether an offense was charged. But here the offense charged is an unlawful conspiracy, and the sending of the letters are but two of the overt acts pleaded.

[4, 5] Another overt act is the procurement of money to carry out the conspiracy, and still another is the giving of a certain sum of money to effect the conspiracy. In an indictment for conspiracy it is not necessary to show how the act charged to be an overt act would tend to effect the objects of the conspiracy. United States v. Benson, 70 Fed. 591, 17 C. C. A. 293; Houston v. United States, 217 Fed. 852, 133 C. C. A. 562. An indictment for conspiracy is sufficient, if some of the overt acts are sufficiently pleaded; and, where several overt acts are charged, it is not necessary to prove them all. 12 C. J. 627.

The judgment is affirmed.